Thank you. May it please the court, I'm Scott Ford on behalf of ACA Financial, with me at council's table, my colleague Brian Richardson, who will be arguing on rebuttal, as well as my colleague Jessica Berczewski. I'll also note that my clients are in the court today. I would like to, for purposes of argument to the court, highlight four particular issues as to why the district court erred in their state claim. The first point would be that there's a very low threshold on 12v6. Our claims must be merely plausible, and that under this lenient low standard, the court must accept all factual allegations pled as true and draw all reasonable inferences in our favor, and our position is that we've met that very low threshold. The second point I would like to make is on the issue of breach of implied covenant of good faith and fair dealing under the series of financing documents in this case. The position of ACA is that we have, in fact, pled a plausible claim for that count. I think it is well settled in Virginia that every contract includes this implied term. In this very court, in the Virginia vermiculite decision, a 1998 decision, held that that was the case and that a breach is shown when a party acts dishonestly or in bad faith as to a clear term or when a party acts arbitrarily or unfairly where there's discretion in performance. And what I think is important in this case is that the financing documents do not provide that the city can refuse to appropriate for any reason and that failing to appropriate when the city has the ability to pay constitutes bad faith and or to minimums arbitrary and or unfair. That goes to count 7. And there are several facts, and of course we didn't get far into discovery before discovery was suspended by the district court, but there are several facts that we know from just the partial discovery that we would assert more than amply permit us to state a plausible claim. And again, that's where we are at this stage, that the city has the money to pay, chooses not to pay. In fact, the city has a budget surplus, excuse me, that the city is not in default on any other of its debt instruments, that the city in this case actually first voted to appropriate and then reversed that decision and voted not to appropriate. The city represented repeatedly as part of this transaction, excuse me, as part of this transaction that they had the money to pay, that it was an essential project for the town and expressed during the terms of the documents that they have had every intention to pay not only in the current session but in future sessions. And throughout the documents, and I could go through them all, I mean, almost every document and almost every resolution, almost every legal opinion, they state that this is not a general obligation. It's subject to the appropriations. So, I mean, whether it's for implied covenant of good faith and fair dealing or the various counts that the city rent, I mean, it seems like that was a known risk and it was a risk that was known because in order to get an obligation beyond that, you had to do a referendum. And so that was just the deal. That was what y'all all knew going in. I'm surprised that we're talking about that part. I thought we'd talk more about the collateral creditor's rights part of the case because it seems to me, you know, that term was just known from day one as much as anything could possibly be known. Well, the term is most certainly in there, Judge Quattlebaum. The term is subject to appropriation. And what I would submit is that that doesn't avoid the need for the court to determine whether or not there was a breach of the implied covenant of good faith and fair dealing. This very court said that in the vermiculite decision that although the duty of good faith does not prevent a party from exercising its explicit contractual rights, a party may not exercise those in bad faith even when discretion is vested solely in that party. Well, where's the bad faith here? Your clients are pretty sophisticated, aren't they? Well, they are sophisticated. And I would say this. So they could fend for themselves in these negotiations? Well, certainly they could fend for themselves, Your Honor, but that doesn't. So where's the bad faith? Well, the bad faith is that they had the ability to pay it and they didn't pay it. They promised in paragraph 4.5 of the lease agreement. But they didn't have to pay it. Well, it was subject to appropriation, right? But they had to act in good faith. And our position is that that's most certainly a question that reasonable minds could differ on and certainly should not have been addressed on the papers at the 12b6. So is the bad faith not to do something that the contract gives them the right to do? Well, the contract gives them the right to do it. But I would submit the contract. There are a series of contracts. In some of the documents, I would submit very clearly say subject to appropriation. There are other provisions in the documents that would seem to suggest that maybe it's not subject to appropriation. I know there are piles of documents in this case, piles of agreements. For instance, 1101 of the trust agreement seems to suggest that there's not language that's subject to appropriation. So wherever you slice it, the term is there. And even arguendo that that term is there does not dismiss the fact that the court still has to reach a determination whether there was a breach of the implied covenant of good faith. Don't we get into a problem if we take your, and I think I understand your position. You're saying that in terms of contract law, that it's an implied term, if you will, that you will do what you can in good faith. Correct. Right. But if we do that, then from a policy standpoint, we have to look at these type of cases. Wouldn't you then, in a situation, you say, well, you know, you had money. You didn't have to fund your schools to that level or you didn't have to fix your streets. So all those things that municipalities have to do, wouldn't we have to say it was bad faith? How would we not get tangled up in that? Well, you most certainly would have to reach a decision whether it was bad faith or not. And I would submit. But that would be based on the budget in terms of making legislative determinations. Isn't that the whole purpose why there are moral, moral obligations? Well, it's based on lots of factors. But I would submit that the factors that could very easily be determined by the court, such as, well, wait a minute, you had nine other debt instruments. This is the only one you chose to default on. Wait a minute. After this debt that you defaulted on, you went and took on discretionary new projects and went out and got new loans. I think the court can very clearly say, we think that that constitutes bad faith. And I would submit that the court has to reach it. Virginia Vermiculite, this very court, said it's, you know, element. Go ahead. I'm sorry, Judge. Do you plead any facts in your complaint about what you just said, that they, that this is the only, this is the only debt that was canceled? Well, we most certainly have pled, as a separate count, breach of implied duties. Yes. If you pled the fact, you're giving us some arguments and we can debate whether those constitute bad faith or not, but those aren't in the complaint, are they? Well, that very fact that they didn't appropriate other, that they took on other debt instruments, I'm not sure whether that's in the complaint. You should know that, counsel, what the complaint says. Now, you're here at the Fourth Circuit. Well, Judge, I don't believe that's in the complaint, but. Can I ask you some questions about, aside from the legal obligation to pay the rent, I kind of, again, I'm more struck by the creditors' rights that the plaintiffs have. And it does not appear that there's a claim for, you know, a foreclosure, which is right. So, I'd like to, but in count two, you talk about enter, take possession, operate, and sell. And as I read the lease, the operative provisions are 7-1 and 7-2. And whether there's an obligation or not to exclude, sell, or lease, you know, there's an argument whether that's an obligation or a right. But before you even get to that, you have to terminate the lease first. And the lease clearly says that the authority has a right to terminate, not an obligation. So, number one. Number two, your clients have the right as trustees to terminate itself. And you don't plead they did that, presumably because they didn't. And how do you get past that condition precedent that there's a termination to go to this next right of taking possession, selling, and lease? Well, I think those remedies are there. And we've not pursued those remedies. And we have non-judicial remedies that are available that we have not pursued, but we could pursue. And I believe that... So, it's your position that that's something you can do in the future? Yes, Judge. But you agree that in terms of, to the extent it's a cause of action, you must terminate first? Correct. And you agree that that hadn't been pled, that that's been done either by the authority or by the plaintiffs? It has not. Okay. Yeah. But in the remaining three minutes, I want to make sure I touch on these last two points that I want to bring to the court's attention. Point number three, that it is the position of ACA Financial that there's been a breach of the trust agreement. And specifically, under the trust agreement 1001C, which is found at joint appendix at page 118, and under the lease agreement at 3.3B, joint appendix of 52, that the promise to pay on the bonds was broader than only, merely from rent appropriated by the city, and that the city conceded, at least my review of their brief on page 11, that they were acknowledging, quoting from the brief, the authority acknowledges that UMB may be entitled to net revenues received by the city from golf course operation. That was a promise that was distinct and separate from whether rent was appropriated or not. Did you plead that? We did plead that. What paragraph was that? That would be paragraph 36 and 76 of the complaint, found respectively at joint appendix pages 18 and 19, and 27 and 28. Therefore, I would assert that as to the breach of the trust agreement, we're beyond the issue of whether rent was appropriated, that moreover, their failure to provide revenue from the golf course constitutes a separate basis for a breach, and most certainly a plausible claim for that count. And then finally, I want to mention the fact that we believe that it's without question there's a plausible claim for breach of the forbearance agreement. And so the paragraphs I want to bring to the court's attention are paragraph 74 and paragraph 8, little 3. And they're both noted on the appendix at 228. And specifically, the way that forbearance agreement worked was that as a new term of that forbearance agreement was this ACA's representation and promise that they would begin paying one half of the amount of the bonds due. They did that for over three years, to the tune of over a million dollars. And 7.4 specifically noted that failure by the city to appropriate payments constituted, number one, an event of default, and then paragraph 8.3 stated very clearly that as an event of that default, that ACA was entitled to an immediate repayment of all of those payments. I would submit that that, in and of itself, is yet another instance of a very clear breach with significant damages over a million dollars, which entitles my client to a day in court. And most certainly, we have reached over the hurdle of 12B6, and I'll bring the court back to that in the remaining few seconds that I have. We're here not after a summary judgment disposition or after a trial. We are here on a review of the complaint. This is a notice of the state, and we believe that we've sufficiently noted viable claims that should survive a motion to dismiss for failure state claims. So if we go just... Yes. So your position is, if you allege that there have been rents and payments, it doesn't matter whether or not at the end it's in the red, I mean, in terms of operation, otherwise... It does matter. And you'll note that on page 11 of their brief, they said they were in the red most of the years. That leads me to believe that there were at least some years that they were not, and that's a clear breach. I mean, we've not entered discovery. We're reviewing these papers on the face of the complaint. Absolutely. Absolutely. Okay. Thank you. Very well. Thank you. Mr. Richardson? I'm sorry. Mr. Rose. Mr. Rose. Mr. Rose, I'm sorry. Mr. Rose. May it please the court, it's Kevin Rose on behalf of the City of Buena Vista, Virginia and the Public Recreational Facilities Authority of the City of Buena Vista, Virginia. Let me ask you a hypothetical. Okay. Suppose a professional golfer who had done very well golfing and had an opportunity in Buena Vista said, you know, I'm going to give you $100 million because I just think golfing ought to be, you know, in this part of Virginia, you're a wonderful city to have, you've got a place here, I'm going to give you $100 million and gave it to them but did not earmark it as such, but he said that and then you put it in your general funds. Is your position then you could say to the bondholders and trustees, you know what, we're not going to procreate any of this money to pay these bonds and you think that you could do that? Just a hypothetical. Yes, they would be able to do that and the reason is, and I guess it starts where they end in their reply brief where they say a ruling in favor of the city and the authority would be earth shattering in this case. In fact, it would actually be the reverse. What would be earth shattering is if this court were to reverse dikes and told that it was any way, shape, or form legal obligation to appropriate the funds because if you do that, what that does is it actually invalidates the entire deal. What it does is it makes it an unconstitutional death and that's the part that ACA and UMB continue to ignore. They'll cite cases from West Virginia and New Mexico, obviously they're not binding on this court, Virginia law, where they did that and the reason we know it would be an earth shattering result is because what did each of those do? They made that conclusion, which is basically reversal of the holding in dikes. They made it so that the ruling was not retroactive and the reason it wasn't retroactive is because had it been retroactive, then every bond deal in New Mexico that was on the books would immediately be illegal. Every bond deal in West Virginia would immediately be illegal. There's different ways to do public financing. You can do general obligation bonds. You can do what people call the revenue bonds, but backed by moral obligations. You can have moral obligation bonds, but the logic such as it is that the courts have applied to it, like in dikes, that makes it work is it has to be moral obligation and it can't be a legal obligation to pay it because if it were, it would violate the state constitution and most states have similar constitutions and this same public financing scheme works in just about every state. Some states have rejected it like West Virginia and New Mexico, but most follow what Virginia do and they could have done a general obligation bond. They chose to go the revenue bond route. In certain situations, you avoid a referendum. Maybe it wouldn't have passed. Taxpayers might not let it go like in the New Mexico case. That case involved a jail. The voters wouldn't approve it, so they tried to get it. So good faith has nothing to do with it? Yeah, I would say not because I think that when you read the documents, it clearly says no legal obligation, no obligation. I mean, there's so many different places throughout the documents that make it abundantly clear that there's no obligation whatsoever. As my bond lawyer calls it, it's a pinky promise and everybody knew going into the deal that they didn't, and the reason it is because the constitution set up to say we don't want the current, whether it's a city council, a board of supervisors, or any local governing body that's making decisions, we don't want them to be putting binding, making binding decisions on debt that affect future councils or future boards of supervisors. So the idea is to not allow the current council or board of supervisors in place, local governing body in place, to bind future ones, and that's the constitutional restriction that's put in. So to get around that debt issue, the debt has to be moral obligation, not a legal obligation because the minute, and I would say this, is if you qualify with any kind of good faith requirement or anything that says they don't have the right to base their decision not to appropriate on any reason or no reason at all, the minute you qualify it in any way, I say that makes it no longer a moral obligation because now there's a legal obligation because it's qualified. Now you have to check good faith. And once you do that, you're going to run afoul of the constitution. You're going to invalidate. Let me ask you one question. You said there's a legal obligation, which clearly they can't do, and then there's a good faith and you said you can't imply that because that would violate the constitution of Virginia. But then you, by your own words, you conceded that it was a moral obligation. What is the substance of the morality part? What is that? Because there's a reason it says it's still an obligation. It's not legal. It's not based on good faith, but it's moral. What's the moral part of it? I guess when you read the documents and you see in there where they say their expectation, their anticipation is. But you agree though, it must mean something, doesn't it? Oh yeah. I mean, moral allegations mean something. But they're not legal. Doesn't it mean, or has to be, going back to my hypothetical, that you're not going to let someone pay a hundred million dollars for this course and you've got all the money, and then you're going to sit back and say, you know, we don't give you a dime because it's just moral. What's moral about that? I guess if the court is going to say it's going to now, you know, basically test whether something's moral or not, the minute you do that, it's no longer moral, it's legal. I don't know how you make the distinction. No, no, no. That's the fallacy of a false dilemma. You know, formal logic. No, no. There are steps along the way. For example, that there are situations where we don't get into whether you're talking about schools versus whatever things are there, but we're talking about a situation where it is so egregious that it would shock moral consciousness for a city to just sit back, have a stockpile, a windfall, and just say to them, we're not going to pay you any more. There's something in between that maybe doesn't violate the Constitution at all, because that's why they said words mean something for the courts and we construe the words. And this is a moral obligation. And what they're saying is they're planning, you paid everybody else. Everything looks well. It looks like maybe somebody said, well, you know, I'm not sure this was a good idea. Let's just stop paying. I mean, at least that's what, and we're at 12B6. We're not, no discovery. Now we don't know what memos might be in there that somebody said. I'm just saying, I'm not, I'm not accused about anything, but that's what, that's why we have discoveries. Oh, looky here. It looked like after this was sent, there was a turn. It had nothing to do with fiscal, nothing. You see, that's why, why is that not a question? In this case, it's not a question because they didn't allege it. I mean, for starters, so if you read the complaint, there's not that allegation. They said it was a moral obligation. They thought they were dealing, they said they were dealing with honorable people and they thought that, that, that you would pay it in a moral obligation. And it means that they thought that. Most cities care about their bond rating, right? Don't most? Oh, that's correct. That's exactly right. And that's the, that's the risk that's run. That's this, this method of bond financing obviously comes at a higher price to the municipality borrowing the money because the lender is going to factor in the risk. And in fact, generally you don't have bond insurance and for a general obligation debt, why would you? Because you can go force the municipality to tax everybody. You don't need a bond. In this case, they needed a bond. That's how they'd be able to sell bonds. So, so, you know, the, the, the, the city had to pay for the bond insurance. I mean, so there's a lot of factors in here that affect that. And obviously not, it's a difficult decision for them to make. And that brings the next question up in line with your line of thinking here is, is, is, is a court going to start now, um, putting itself in and looking behind what the city does when the city council sits down and decides it wants to spend its money on schools and wants to spend its money on fixing the roads. And here's how much money we have and can spend and makes the decision, the difficult decision of we cannot afford to make these bond payments anymore. And they do that. They know it comes with a price because they know the next time, because when, when a bond ratings occur and, you know, like as with any lending credit worthiness is going to be factored into the interest of full disclosure going forward, you really should put in there from the city and say, you know what? We don't have any obligation, moral or otherwise, and we can decide not to pay you a dime. That's what ought to be in the, in the papers. Cause that's basically what you're saying. It does say that in the papers. I don't know how more clearly it could be. Oh, it's not, no, no, no, because you, you put it yourself. You're the one saying it's a moral obligation. And that sentiment is throughout the dealing in terms of bonds that people think they are, they're dealing with people across the table in good faith and trying to help the city do what they want to do and help people who invest in those bonds, make money as well. That's me. That's our system, the way it works. And you're saying that basically your theory, we should just make it clear to me. I think you ought to tell people the truth. If that's the position and say, look, we don't have any obligation at all. Moral or otherwise, and we can discontinue this at any time for any reason or no reason, right? That's your position. In the bond world. Everybody knows what you just said. Everybody knows what you just said is the case that it, that's the way it is because it has to be that way. Cause if it's any legal obligation whatsoever, then it's going to run afoul of the constitution. The whole deal is done. Did all or the trustee, the purchaser of all the bonds here? The, the way the trustee, the bank that's holding it, they're really not exposed here. Who's chasing the dollar and figuring out what's going on here. It's the bond insurer and because they're the ones that are going to have to write the check to pay all this off. And it gets back to one of the questions. I forgot which one of y'all they brought it up about the issue of has the deal been terminated? Well, of course they don't want to terminate the deal. Cause the minute you terminate the deal, there's no hope to continue putting the PR pressure and all the other pressure they've been putting on a city hoping the next city council might appropriate the money. So if you leave it alive each year, maybe the future city council would change. Plus there's time, value and money. You know, maybe they've got their money in a reserve sitting somewhere making interest. Maybe they're making more interest than the interest they're paying on the bond. I don't know, but whatever. Let me ask you about count eight, the receiver. Because I agree a receiver is a remedy and not a cause of action. The way it's labeled, it might call someone to look like it's a cause of action. But in that cause of action, they do allege the breach of the underlying obligations and they do cite to the provisions of the agreement that give, um, the receiver as one of the remedies. Um, and I, I, I, I, I don't think that, I mean, putting all the other issues aside, cause, uh, but that one issue looks like it was pled with the appropriate causes of action. So my, I have two questions. A, you know, tell me why that's not true. If it's not true in B, was that appealed by the plaintiffs? One, uh, they didn't address it in their briefs for whatever reason. They, they, they don't, they don't address that. But aren't in the briefs, right. But, but, you know, I know they didn't address it, but, but getting back to your first question, the reason that the receiver, uh, doesn't actually won't state a claim is, is because they, as of the time they filed this complaint, they didn't allege it. I believe if you take a careful look at the, um, the, the, uh, the deeds of trust, it requires that the, uh, the debt be accelerated. And as of the time they had filed this, they hadn't accelerated it. And so our position would be is until they accelerate the debt, they can't appoint a receiver anyway. You think there's a condition precedent they must exercise before they ask for the appointment of a receiver? Yes. And so they, they haven't, you know, they have not done that. Let's assume that's not the case. I'm not suggesting it's not. Is there any other reason that's not a valid claim? Um, I'm thinking why, I mean, I'd have to rely on back what our arguments were in a memorandum, uh, that we filed in the lower court. I can't remember. I didn't focus on that one a lot because it looked to me like they were abandoning it. So I really didn't come here prepared that much to address that. So your point about that they didn't raise it in their brief goes to judge Quattlebaum's second question as to whether they raised it. They've waived it. Yeah. I would say they have. So if it's valid, right. I don't believe it's valid for the other reasons. I think it's cited as a footnote in their opening brief. And that's all the attention it got. And so that was my question about waiver. Yeah. And I think some of these things, I mean, it gets to, uh, when you're talking about collateral creditors rights and foreclosure and whatnot, um, you know, they, they, there's the deeds of trust or deeds of trust. They have foreclosed, you know, nonjudicial foreclosure rights under Virginia law and included within those deeds of trust have this right to appoint receivers. And there's been some discussions and whatnot on that issue as this case has proceeded. And does the city dispute that while it could allege defenses at the time that those creditors rights still exist? The, um, I think they put in their brief that, that we're saying they can't foreclose or whatever. What's basically occurred as this, these proceedings have been underway is, uh, they've been, um, you know, they haven't actually put a notice of foreclosure out or anything like that. We basically just told them our read of the, of the, um, deeds of trust is, and we believe we're right, is that until they accelerate the debt, um, they're not allowed to take their, uh, nonjudicial foreclosure. And so that's where kind of the rub is. It's not that we're saying you can't foreclose. And obviously if they were to foreclose and we run into the situation with, uh, you know, the, the, the tricky part of this is when they, you know, pledging a courthouse, the, the city hall and the courthouse are in there. And then you get in all these other issues. Uh, well, you know, the judge can say, Hey, you can't sell my courthouse. And then, and then it's going to get complicated because if they did try to foreclose on your courthouse, can you, can you carve it out? Well, yeah, I get the complication of that, but it's the city's position that at least subject to the documents, those creditor's rights still exist so that the trustee or the bond insurer would have the rights. If, if the failure to appropriate language is, you know, held to be enforceable, those still creditor's rights still exist? That is correct. The, the, they just need to comply with, you know, the doc, the documents applicable law. Um, and, and they would have a right to foreclose to sell the golf course. They can come in and take the golf course back. And, um, you know, our, we, we believe that the reason they're not doing that is because what we say that they have to accelerate, they're going to have to write a big check and gain it's game over at that point. Cause now they just had to pay everything off and we're all done. And so, uh, but who knows what they may be thinking or why they're not pushing that. Um, but anyway, so, you know, I, I, I get back to, um, you know, I want to touch on this revenue issue that they're talking about because I think that also, uh, is in line with some of these other arguments they make. I think a lot of what they've done here is their conclusory allegations aren't really facts. I mean, they'll make, they'll make statements such as that, that, you know, he wrote, he was talking about in the complaint paragraph 76 where they say they failed to pay the bonds quote in the manner specified in the trust agreement, end quote. And then they want to imply that that would include that there were, um, that they have to pay from the revenues, which is, is, and what that basically is saying under the, there's two D's of trust, but under the authority's deed of trust, it does say that it, cause it's a revenue bond. Well, what's the revenue? The revenue is the rent payment from the city. And so that wasn't adequately pled. Yeah. I'm saying, well, no it was not adequately pled. But what, you know, it's one of these things where, how I think what I hear them saying is, but I'm, but they don't really say it is I think what they're trying to say is, is that, um, the only way this would work is is the city made a rent payment to the for the bond payment. Otherwise it wouldn't be a bridge. I mean, it's what they're saying. And I would say this before they need to do something like that, they need to take a careful look at rule 11. They've seen everything in this case. They've got all the documents. They know whether a payment came and did not get paid. To my knowledge, that that is, that would be a false factual allegation and complaint. The same thing would be hold true with respect to the, uh, since the time in 2015, uh, when they stopped appropriating money. It's my understanding that the golf course has been operating at a loss the entire time. And it's not a situation where the golf course made money that it could have then paid them. And so, uh, but anyway, they didn't allege that, um, clearly in here, you know, this to my knowledge was not an issue, um, until, you know, it was brought up, you know, here, it, it, on the, in the appeal briefs that they filed was the first time we heard of it. It was not an issue in the court below. And so we hadn't, I had no clue that they were trying to say that because frankly, we don't believe there's any truth to that, uh, allegation whatsoever. But I would say it's, it's, that's a classic example of a conclusory allegation. How hard would have it been to, if that's what they're really trying to say, how hard would have it been to actually say that so that we could understand that's what the claim is? Because I'm not even entirely sure as I sit here right now that that's really what they're saying, because I know it's, I don't believe it's true. I don't believe they would say it. So maybe there's some other logic that I'm still lost on of their argument about these revenues, but we're not aware of any, um, that it was, you know, alleged or was even an issue in this case. Um, so any of that, the, um, you know, I think, um, the, the, I thought the district court did an excellent job of just kind of laying us all out and explaining it. I don't think I can really do a much any better job going over and explaining how they did to break down how the public finance laws work and why this deal has done the way it's done. And they're sophisticated parties. The documents speak for themselves. I mean, in reality, you never need to get off the four corners of the documents. They're pretty, they say what they say. Dykes case comes in to kind of clean it up and explain why. Um, because the Dykes case just explains and keep in mind a lot of these cases like Dykes, Winkler, Montana, normally when they're brought, that's because the taxpayers are trying to stop the deal. So most of these cases, and then if the court rules, we know whether, you know, they can actually do the financing or not. They're not after the fact like this. But, uh, you know, this court with, with, um, aren't, well, basically we, our position is armed with the documents and what they say within their four corners and Dykes, this case should be dismissed because they haven't stated anything that gets them out of that. Um, I understand they can make arguments that, you know, debate. The only argument really have is a moral obligation is really a legal obligation. I just, I don't know how you square that away. I just don't know how you get there. And, uh, um, and these issues about implied covenants of good faith, um, you don't imply good faith. If it's contrary to what the parties have already got in writing. And it's clear in this case that there was no legal obligation. So now they're trying to improve, impose the legal obligation of, of an implied covenant of good faith. It's not in the moral obligation that you don't say something that's false at the time you make it. And they haven't pled. I don't think a cause of act, that would be fraud that, that, that, you know, that you haven't pled or that there's, I mean, you still can't do that. You can't defraud people, uh, of course. Right. And, and, and anyway, I'm not, I'm just, that's correct. And I see I'm out of time right now because I'm going to finish answering you. I want you to finish because yeah, go ahead. You said there is, there is the fraud would, would, would make you obligated. No, the fraud that I was going to say that they did allege concerns our, uh, defense that we had put in the case that said that they, the, the, uh, the deed of trust, the city deed of trust was not actually, um, uh, instituted properly and it lacked authority. So that was my understanding. That's part of what I was questioning. If your question is that if there is a moral obligation, it would be in the, in the actual formation aspect where you represented that you intended to be, I guess, I'm a bond is one way, but you just make this and you knew, I suppose in your mind and you never had any intent to appropriate anything. Yeah. Do you agree with that? If that was the case? Yeah. I think law in Virginia for fraudulent inducement of a contract. If you went in and, and, and lied and said you had every intention to, to, to do this and then didn't or whatever. And you knew at the time you weren't, they could prove that. But in this case we have a situation where the deal was put in place and then actually was went for it. Remember it was 2005. It went on for 10 years. So it'd be hard to be fraud and inducement in terms of formation. You have to get back to the city council and they all got together and said, you know what, we're going to tell them we're going to pay this, but we're not. I mean, it would be a lot better argument for him at the very next year. They didn't appropriate. The problem is that though, if you define it that way, then it's like a chicken or egg. How do you get to moral obligation if you haven't reached formation? Moral obligation would suggest that it exists post agreement, wouldn't it? You wouldn't have a moral obligation inducement. You know, you never had formation. That's the problem with that side. Inducement is before you get to the whole point of agreement, moral obligation, if it exists, if you say it doesn't anyway, but if it did exist, it would have to exist post agreement, not pre agreement that fraud and inducement say, no, you don't have a contract at all. It never was miles and met because you intended all along not to do anything. So he didn't meet the mind. So you still say there's no moral obligation, really? Well, the, the, uh, and that's an interesting issue. I think that, uh, cause you could run into lack of consideration, but, but that, that's why this thing's really, it's moral obligation back in the revenues, back in the pledges of collateral. There's lots of other consideration. This, this component of you'll appropriate. And most of the time I think of these appropriations are really the point of the appropriation is if the revenues don't generate enough money, you'll appropriate to make up the slack. That's the typical bond deal. Um, and, uh, and so that, that's how that's normally done. So it's not like the intent is always that the appropriations are the main way of paying it. It's really more of the back. It's a backstop. In this case, the backstop didn't hope that the revenues and operation would have done it. Right. And we got a golf course. Okay. Surprising buddy. Thank you. Oh, thank you. Council. Mr. Richardson. Thank you, Your Honor. May it please the court. Uh, my name is Brian Richardson. I'll be making a few points on rebuttal. Um, Mr. Richardson, uh, Mr. Rose said, I'm almost quoting him. I'm close paraphrase. The whole world knows this is how it works. How did you not know? You meaning the clients and the smart people around the table who, uh, I practice law, you know, our firm did bond work with my very smart partner. She did all the bond work. I did litigation and all that kind of stuff. But they said everybody around the table knew that's the, that's how it works. You know, there's no, there's no obligation. You don't have to do this. And I don't care how many people we paid. They didn't pay you. That's that is sure. I think that's council's perspective on this, that, that everyone knows that this is how this works. I think if you ask other people in the bond world, they, they would say that this situation is highly, um, uh, improbable that you don't have many municipalities throughout the country, just defaulting on loans, uh, on a whim. And your question, uh, to council, I think is an appropriate one. And that is, is a moral obligation, no obligation. And we don't think that it is no obligation. There certainly is an obligation, um, to the extent that we have a moral obligation here. We still have an eye. There's still the idea that the parties cannot act arbitrarily. Now, I think at, during the beginning of our argument, uh, with my, my colleague, I think the thrust of the discussion was about whether or not this was done in bad faith, but that's not the only thing that the court has to look at is the, the idea of bad faith. In all, um, contracts in Virginia, the implied warranty of good faith and fair dealing is an implied element in all contracts. And in order for a party to breach the duty of good faith, uh, they can do that in two ways by acting dishonestly, which is the bad faith that you guys were talking about, um, with respect to a clear contract, right. Or where the party has discretion and performance by acting arbitrarily or unfairly. Back to your point that you made at the very beginning of, uh, of, of, uh, argument today, to the extent that they were sitting on a hundred million dollars and they decided that they didn't want to appropriate because they had thought they had a moral obligation that they didn't have to live up to, that would be acting with discretion and performance. And that would be acting arbitrarily and unfairly. And that is something that cannot happen in Virginia. And so as counsel has stated, uh, in, in his rebuttal, that, uh, to, to, to rule otherwise would be earth shattering. We think the exact opposite. It would be earth shattering to say that parties can act in when, when acting with discretion, that parties can act unfairly and arbitrarily, which is exactly what's happening in this, in this case. We can't have rule for, um, for your side without, um, being at odds with the Dykes case in Virginia. I don't think you would be at odds with the Dykes case. Okay. Why, why not? So there are so many elements about this case that are different from Dykes. And the reason why they're that we're even focused on Dykes is that's the closest case that comes to just even talking about this idea of moral obligation. But the problem with Dykes that we don't have, um, that is, that is different from what we're dealing with here. Um, I mean, Dykes didn't involve forbearance agreements. Dykes didn't involve, um, the pledge of collateral owned by the city or authority, for instance, police stations and the like. Dykes is a case talking about the constitutionality of whether or not, uh, Yeah, but the forbearance agreement has the same provision in 5.4. You talked about some obligations, but every single document has the subject to appropriations. And that's what Dykes is talking about. It does. But, so we have a situation here where a sophisticated by party, a bond purchaser, I mean, it's, it's not like we're talking about, you know, an individual who doesn't know what they're doing has been a party to a transaction that probably 10 times is this financial obligation is subject to appropriations. Now wants to say there's some implied obligation inconsistent with express obligations that they sign. And that's not what we're saying. What we're saying is there, there are express obligations that there are, that if you have discretion and performance, which these contracts clearly do that, you still cannot act arbitrarily or unfairly. And so we should be able to get to the point through discovery to be able to discern whether or not that has happened. And that's what we're saying at the 12B6 stage. Could I ask you one more question? I appreciate that response. Does the plaintiffs have a position on my questions about count a receiver? We didn't waive it. I mean, the thrust of our, of our argument today, obviously is, is one based in contract and the implied covenant of good faith, but we do mention it in our in our, in our brief. So but to, to sort of bring this back to, to where we think that it all starts, judge Moon clearly states that we have a contract. No one, that no one disagrees that we have contracts, that there are valid contracts that we have here. And if that's true, then the both this court, as well as the SunTrust court have held that parties cannot act arbitrarily or unfairly. They cannot, when they have the ability to pay, just choose not to because they say it's a moral obligation. That would be an amoral obligation, not a moral obligation. Though the fact that they have discretion and performance only means that they still have to act within the grounds that the, that both the fourth circuit as well as the Virginia Supreme Court have held is necessary. And that is not acting arbitrarily or unfairly as well as not acting in bad faith, which you guys have touched on. But I believe that if, if we're able to get past this stage, we will then be able to determine whether or not folks are acting arbitrarily or unfairly. Judge Moon seemed to suggest that opening up the can of worms of, the implied covenant of good faith and fair dealing could create more litigation and make us have to, or make, create litigation that otherwise wouldn't exist. But again, we respectfully believe the exact opposite. When parties have discretion in performing, they must act without being arbitrary and they must be fair. And for those reasons, we believe that this court should remand this case and reverse this decision. Thank you.
judges: Roger L. Gregory, Stephanie D. Thacker, A. Marvin Quattlebaum Jr.